NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-112

STATE IN THE INTEREST OF JNA, RMD AND MPD

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. J-38-12
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

AFFIRMED.

David E. Marcantel
P. O. Box 1366
Jennings, LA 70546
(337) 824-7380
COUNSEL FOR DEFENDANT/APPELLANT:
    T.M.D. (mother)

Nicholas Pizzolatto, Jr.
Region VI Attorney
P.O. Box 1487
Lake Charles, LA 70602
(337) 491-2066
COUNSEL FOR APPELLEE:
    State of Louisiana, Department of Children and Family Services

**Timothy M. Cassidy**
**P.O. Box 1446**
**Jennings, LA 70546**
**(337) 824-7322**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Unknown father of M.P.D.**

**William J. Riley, III**
**P. O. Box 509**
**Jennings, LA 70546**
**(337) 824-9158**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**J.R.A. (father of J.N.A.)**

**Robert J. Sheffield, Jr.**
**One Lakeshore Drive, Suite 1800**
**Lake Charles, LA 70629**
**(337) 405-8546**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**C.A. (father of R.M.D.)**

**Stacey C. Naquin**
**Assistant District Attorney**
**Thirty-First Judical District**
**P. O. Box 1388**
**Jennings, LA 70546**
**(337) 824-1893**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Franchesca L. Hamilton-Acker**
**Acadiana Legal Service Corporation**
**1020 Surrey Street**
**Lafayette, LA 70501**
**(337) 237-4320**
**COUNSEL FOR APPELLEES:**
**J.N.A. (child)**
**R.M.D. (child)**
**M.P.D. (child)**

**PETERS, J.**

T.M.D.,[1] the biological mother of three minor children, appeals the juvenile court's judgment terminating her parental rights.[2] For the following reasons, we affirm the judgment in all respects.

## DISCUSSION OF THE RECORD

T.M.D. (referred to herein as "the defendant" to limit the reference by initials) is the biological mother of three daughters: M.P.D., born on March 13, 2004; R.M.D., born on March 6, 2006; and J.N.A., born on September 5, 2007. Each child has a different father, with M.P.D.'s father being unknown. The defendant has a history with the State of Louisiana, through the Department of Child and Family Services (hereinafter referred to as either "the state" or "DCFS"), dating back to 2004.

The judgment at issue in this litigation arises from an oral instanter order issued by the juvenile court on July 29, 2014, ordering that the state immediately take the three children into protective custody. The juvenile court issued the order based on the affidavit of Shamira Lyons, a Child Protection Investigator employed by DCFS.

In her affidavit, Ms. Lyons asserted that the state had received a report that the defendant neglected and failed to supervise the children by continuing to associate with men M.P.D. had previously accused of sexually abusing her, and that the defendant had informed her case worker that she and her daughters were moving to Puerto Rico with a male friend, F., whom M.P.D. had also previously accused of sexually abusing her. Ms. Lyons further referenced the fact that the

_____

[1] The initials of the children and their parents are used to protect the identity of the minor children. Uniform Rules—Courts of Appeal, Rule 5-2.

[2] The parental rights of the biological fathers of the three children were also terminated by the juvenile court judgment, but none of these individuals have appealed the judgment.

state had removed the children from the defendant's custody in 2012, for similar complaints concerning M.P.D. being sexually abused by another one of the defendant's boyfriends. In both situations, the defendant simply refused to believe M.P.D.'s assertions of abuse and opposed any effort by the state to require that she discontinue the relationships with her many male companions and/or stop allowing M.P.D. to have unsupervised contact with the alleged abusers. Additionally, Ms. Lyons asserted in her affidavit that the defendant had rejected all of the state's offers of assistance in addressing her many parenting issues.

The juvenile court confirmed the oral instanter order after a July 30, 2014 hearing. Thereafter, on August 15, 2014, Ms. Lyons provided the juvenile court with a supplemental affidavit, wherein she asserted that the three children were doing well in foster homes; the defendant's visits with the children were going well; at that time, the defendant was residing with R.M.D.'s biological father;[3] and she was considering a move to Texas with a friend. Ms. Lyons further asserted in her supplemental affidavit that the defendant had received $1,400.00 for her children's Supplemental Security Income (SSI) benefits on July 28, 2014; had spent all but $400.00; and could not produce receipts to explain how the money had been spent.[4]

An August 29, 2014 family team conference attended by the defendant resulted in an agreed-upon case management plan, with a primary goal of reunification.[5] The case management plan included the requirements that the defendant obtain secure and safe housing; obtain a source of steady income to

---

[3] M.P.D. had accused this man of sexual assault as well.

[4] The defendant had suggested that it had been spent on "groceries and stuff."

[5] The case plan included a secondary goal of adoption of the three children.

2

provide the resources required to meet the children's needs; maintain contact with the children through visitation; pay $25.00 per month to the state for the children's support as a demonstration of financial responsibility;[6] recognize that her mental condition affected her ability to care for her children and address that condition in order to focus on the needs of her children; and to acquire "healthy coping mechanisms, appropriate anger management, and effect responsive age appropriate parenting skills." Relative to day-to-day parenting, the case management plan required the defendant to increase her parenting skills; demonstrate her ability to recognize her children's needs and take appropriate actions to reduce their risk of harm; demonstrate that she can put her children's needs ahead of her own; and acknowledge the affect that her lifestyle and choices have had on her children's safety and wellbeing. The state filed the case management plan with the juvenile court on September 11, 2014.

The state filed a petition to have the children adjudicated in need of care on September 2, 2014, and following an October 30, 2014 hearing, the juvenile court adjudicated the children to be children in need of care and maintained them in the custody of the state. The juvenile court executed a written judgment to this effect on February 3, 2015.

On the same day it executed the adjudication judgment, the juvenile court reduced to writing its findings from a December 18, 2014 case review hearing, wherein it had approved the case plan; continued the children in the custody of the state; and approved the goal of reunification, with a concurrent goal of adoption. At the next case review hearing, held on June 4, 2015, the juvenile court changed

_____

[6] In July of 2014, when the children were placed in the custody of the state, the defendant's primary source of revenue was the monthly SSI benefits paid on behalf of M.P.D. and J.N.A. through the Social Security Administration.

the goal from reunification to adoption.

On August 26, 2015, the state filed a petition to terminate the parental rights of all four of the biological parents of the three children and to have the children certified as eligible for adoption. In the petition, the state traced the history of the defendant's involvement with DCFS beginning in 2004.

The termination hearing extended over a two-day period beginning on October 7, 2015, and ending on January 4, 2016. Upon completion of the evidentiary stage of the hearing, the juvenile court rendered judgment concluding the state established that the parental rights of the defendant and the three biological fathers should be terminated pursuant to La.Ch.Code art. 1015(4) and (5). The juvenile court further concluded that the best interests of the children would be served by the termination of their parents' rights to them. Based on these factual and legal conclusions, the juvenile court ordered that the state maintain custody of the children, and certified them free and available for adoption. The juvenile court executed a written judgment to this effect on January 11, 2015, and the defendant perfected this appeal.

In her appeal, the defendant asserts that the juvenile court erred in finding that the state proved by clear and convincing evidence that she abandoned her children, or that she failed or refused to comply with the requirements of the case management plan, such that her parental rights should be terminated. She further asserts that the juvenile court failed to consider whether it was in the best interest of her children that her parental rights be terminated.

**OPINION**

The law pertaining to the termination of parental rights is set forth in *State ex rel. H.A.B.*, 10-1111, pp. 28-32 (La. 10/19/10), 49 So.3d 345, 366-68 (alteration

4

in original), wherein the supreme court stated:

> In every involuntary termination of parental rights case, there are two private interests involved: those of the parents and those of the child. *State ex rel. J.A.*, 99-2905, p. 7 (La.1/12/00), 752 So.2d 806, 810. On the one hand, parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)("liberty interest at issue . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982); *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160-61, 68 L.Ed.2d 640 (1981). This "commanding" liberty interest, which is "far more precious than property right," does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 U.S. at 753-59, 102 S.Ct. at 1395-97. On the other hand, however, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care as "[t]here is little that can be as detrimental to a child's sound development as uncertainty over [where] he is to remain." *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513, 102 S.Ct. 3231, 3238, 73 L.Ed.2d 928 (1982). While a parent's interests "undeniably warrant deference and, absent a powerful countervailing interest, protection," *Lassiter*, 452 U.S. at 27, 101 S.Ct. at 2160-61, that deference and protection should always bow to the child's countervailing interests, which our courts have deemed to be superior and paramount. *Id.*; *State ex rel. K.G.*, 02-2886, p. 5 (La.3/18/03), 841 So.2d 759, 762; *State ex rel. J.A.*, 99-2905 at p. 8, 752 So.2d at 811.

> Regarding the State's solemn role in such proceedings, this Court has aptly provided:

>> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability

for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. La. Child Code art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. . . .

*State ex rel. J.A.*, 99-2905 at pp. 8-9, 752 So.2d at 811.

A State's interest in finality is unusually strong in child custody disputes. *Lehman*, 458 U.S. at 513, 102 S.Ct. at 3238. Still, while the State has an "urgent interest" in a child's welfare and in providing the child with a permanent home, the State's interest must favor preservation over severance of biological familial bonds as long as there is reason to believe a positive, nurturing parent-child relationship exists. *Santosky*, 455 U.S. at 766-67, 102 S.Ct. at 1401; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. Thus, parents, who are faced with the possibility of forced dissolution of their parental rights, must be provided with fundamentally fair procedures in order to ensure children's legal bonds are not erroneously severed from fit parents. *Santosky*, 455 U.S. at 753-54, 102 S.Ct. at 1395.

In order to adequately protect the parents' rights in termination proceedings, the United States Supreme Court has held the clear and convincing evidence standard of proof strikes a fair balance between the biological parents' rights and the State's concerns for the child's welfare and placement in a permanent home. *M.L.B. v. S.L.J.*, 519 U.S. 102, 118, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996); *Santosky*, 455 U.S. at 769, 102 S.Ct. at 1403; *State of Louisiana in the Interest of J.M., J.P.M., and M.M.*, 02-2089, p. 7 (La.1/28/03), 837 So.2d 1247, 1252. "[S]uch a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." *Santosky*, 455 U.S. at 769, 102 S.Ct. at 1403. However, "the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts." *Santosky*, 455 U.S. at 769-70, 102 S.Ct. at 1403.

Our Legislature enacted Title X of the Children's Code to govern the involuntary termination of parental rights in this state. *State ex rel. K.G.*, 02-2886 at p. 5, 841 So.2d at 762. Its provisions

6

emphasize the primary concern in all termination proceedings is to secure the best interest of the child:

> Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if at all possible, to achieve the child's adoption. The procedural provisions of this Title shall be construed liberally. The proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for children.

La. Child. Code art. 1001.

La. Child. Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. *State ex rel. K.G.*, 02-2886 at p. 5, 841 So.2d at 762. In order to terminate rights, the court must find the State has established at least one of the statutory grounds contained in its provisions by clear and convincing evidence. *See State in the Interest of ML & PL*, 95-0045, p. 4 (La.9/5/95), 660 So.2d 830, 832; La. Child. Code art. 1035(A); *see also Santosky*, 455 U.S. at 769, 102 S.Ct. at 1403. Notwithstanding, even upon finding the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines to do so is in the child's best interest. La. Child. Code art. 1037(B); *State in the Interest of C.J.K.*, 00-2375, p. 8 (La.11/28/00), 774 So.2d 107, 113.

Whether termination of parental rights is warranted is a question of fact, and a district court's factual determinations will not be set aside in the absence of manifest error. *State ex rel. K.G.*, 02-2886 at p. 4, 841 So.2d at 762. In applying the manifest error standard, an appellate court seeks to determine whether the record reflects the district court was clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

The statutory grounds under which parental rights may be terminated are found in La.Ch.Code art. 1015. In seeking the termination of the defendant's parental rights, the state relied upon both La.Ch.Code art. 1015(4) and (5). Louisiana Children's Code Article 1015(4) provides:

> Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

7

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

Louisiana Children's Code Article 1015(5) provides:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Furthermore, La.Ch.Code art. 1036(C) and (D) set forth the basis of the evidence required to establish a parent's failure to comply with a case plan or the lack of a reasonable expectation of significant improvement in the parent's future conduct:

C.  Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

In this matter, the juvenile court heard the testimony of a number of witnesses including the defendant, and much of the factual background is not in dispute. The defendant, who was thirty-five years old when the current matter was heard by the juvenile court, acknowledged the particulars of the case management plan as previously set forth; acknowledged that she had a history of involvement with the state extending back to 2004;[7] and acknowledged that DCFS had taken custody of her children for a ten-month period beginning in 2012, based on M.P.D.'s allegations of sexual abuse at the hands of C.B., one of the defendant's

---

[7] M.P.D. was six months old when the state first intervened.

many boyfriends. She testified that she believed M.P.D.'s allegations initially, but began to disbelieve her after the story changed and after a physician was unable to find evidence of abuse.[8] When her children were returned to her ten months later, she was living in Lake Charles, Louisiana.

The defendant testified that when the children were removed from her custody in July of 2014, she was temporarily living with a friend in Iowa, Louisiana. She denied telling any DCFS social worker that she had planned to leave Louisiana with F. In fact, she denied having any relationship with F. in July of 2014. Instead, she asserted that her plan was to move to a larger home as soon as she could afford it, and that her children's SSI benefits would allow her the financial flexibility to accomplish such a move.

The evidentiary record establishes that a lack of money did not prevent the defendant from moving frequently during the fifteen-month interval between her loss of custody and the termination hearing. She acknowledged that she changed her residence in and out of Calcasieu Parish approximately fourteen times during that period.[9] The defendant testified that she kept her social worker apprised of her various moves, except her last, and that her longest stay at any given residence was six months. Her excuse for failing to notify her social worker of her last move was that she ran out of cellular telephone minutes.

---

[8] Although she did not believe M.P.D.'s assertions concerning F., the defendant testified that she recently learned that M.P.D. had been sexually molested by a second man, C.B., in 2012.

[9] The defendant moved all over Southwest Louisiana, maintaining short-term stays in the communities of Esterwood, Iowa, Jennings, Laccasine, Lake Charles, Sulphur, and Welsh.

At the time of the termination hearing, the defendant shared a three-bedroom trailer with her cousin and the owner/lessor of the trailer, Gaynell Clement.[10] The trailer was located in Iowa, and was also occupied by Ms. Clement's fiancé, Edward Newman, and by Ms. Clement's two adult children (aged twenty-two and nineteen). The defendant's private area in the trailer was limited to one bedroom, which she claimed would be large enough for her and the three children if they were returned to her. At the same time, the defendant suggested this arrangement was only temporary because she and her cousin planned to pool their money and move to a larger residence, as soon as the defendant regained access to her children's SSI funds.

The record establishes that transportation and finances have been some of the defendant's basic problems with regard to complying with the case management plan. She has neither a vehicle nor a driver's license, and depends totally on others for transportation. Furthermore, she readily admitted that without the children's SSI benefits, she might not be able to provide a stable home for them. At the time of the termination hearing, her only income was food stamps having a total value of $194.00 per month.

The defendant's work history post-2004, supports her asserted need for her children's SSI benefits because it is sporadic at best. In 2005, she worked at a Jennings truck stop for three months and followed that job in 2006 or 2007, working as a dishwasher at a Jennings restaurant. When her employer reduced her hours, she quit that position. Next, she worked for a hospital for a month, but was let go because she worked too slowly. A week of employment at a Popeye's establishment proved too much, and she quit and returned to the truck stop job.

---

[10] She claimed not to have a boyfriend at that time, and asserted that she had no plans to establish or renew a relationship in the near future.

11

Three months later, she was laid off from the truck stop, and she held no other employment from that time through July of 2014, when her daughters were removed from her custody. Beginning in October of 2014, she held a home health care worker's position for approximately six months, but ceased that employment when she claimed to have suffered an on-the-job knee injury. Her claim for workers' compensation benefits associated with this purported injury was rejected; and with the exception of two short-term employment opportunities, this was the last employment position she held prior to the termination hearing.[11] She testified at the termination hearing that she was awaiting a decision on her application for SSI benefits, based on a determination made by the rehabilitation office[12] in Lake Charles, that mental problems render her incapable of holding a job. She admitted that she made no support payments for her children's foster care, as required by her case plan.

With regard to her mental health situation, the defendant testified that she is currently under the care of Dr. Murphy[13] for depression, anxiety, bipolar disorder, schizophrenia, and two split personality disorders; and that the medication she currently takes renders her condition stable.[14] The defendant did submit to counseling once per week, but stopped in August or September of 2015. Her

---

[11] There is some evidence that she worked for one day at Martin's Dry Cleaners in Sulphur, Louisiana, and at a Pitt Grill establishment for a short period of time, but the time sequence of these employment opportunities is unclear from the record. In both cases, she said that her employment was terminated based on her inability to grasp her job duties sufficiently to work at an acceptable pace.

[12] This reference to the rehabilitation office gives no particulars as to the name of the office or its location other than that it is in Lake Charles, Louisiana.

[13] The record does not contain Dr. Murphy's full name, his area of expertise, or the location of his professional office other than to say it is in Lake Charles, Louisiana.

[14] Again, the record contains no evidence other than the self-serving testimony of the defendant to support this testimony.

excuse was that her latest move required her to change counselors, but apparently she never followed through to do so.

With regard to the parenting class requirement, the defendant began classes but attended only three of the sixteen classes. She based her lack of attendance on her lack of transportation. She claimed that the counselor providing the classes was supposed to accommodate her by holding them near her residence, but failed to do so. She further testified that the counselor was rude, uncooperative, and tried to convince her to give up her parental rights. She did contact Mathew Sias[15] concerning parenting classes, but testified that she never followed up because she did not have the $250.00 amount she said she was told was required to begin the classes.

Visitation was initially scheduled every other week, but was subsequently reduced to once a month. Unless she was sick, or unless DCFS cancelled the scheduled visit, the defendant generally kept the schedule. It is not disputed that the defendant and her children interacted favorably at the visits. The children were receptive to her and freely shared information concerning their daily lives with her. Often, however, M.P.D.[16] was an exception to the generally favorable visitation opportunities, as she was usually ignored by the defendant. Often, the defendant's interactions with M.P.D. would leave the child in tears. Still, even M.P.D. expressed her love to her mother and the fact that she missed her. While M.P.D. seemed to never be happy, the other two children exhibited the opposite

---

[15] Other than his name, nothing in the record identifies Mr. Sias, his qualifications, or the nature of his business despite the fact that he also testified. In his testimony, Mr. Sias stated that the defendant telephoned him on August 15, 2015, concerning the costs of parenting classes. He informed her that the cost was $200.00, and she never contacted him again. According to Mr. Sias, the defendant did not tell him that she had already participated in parenting classes.

[16] The state moved M.P.D. to a group home in Ruston, Louisiana, to address her personal issues sometime after she came into its custody.

13

characteristics.

While acknowledging that R.M.D. had bonded with her foster mother and called her "mom," and that J.N.A. loved her foster mother, the defendant also asserted that the two were always asking when they would be going home to her. The defendant expressed her concern that if she did not regain custody, her daughters would be permanently separated from one another. She suggested that the return of her children would allow her to complete the case management plan.

Barbara LeBlanc, a Court Appointed Special Advocate (CASA) for the children, attended the visitation sessions, and testified that as long as a supervising adult was present, the defendant interacted appropriately with the children; and the children reacted to their mother by hugging and kissing her, and telling her they love her. She disagreed that the children were always asking to be reunited with their mother. Although she has heard them ask the defendant about *when* they would be returning home, she never heard any of the children state that they *wanted* to return to their mother. She described the bond between the defendant and the children to be more like that between friends than that of parent and child.

According to Ms. LeBlanc, when the visits first started, there were occasions when the defendant told the children inappropriate things. DCFS became aware of these communications when the children repeated them to their respective foster parents and the foster parents passed them on. The inappropriate comments and the arguments with M.P.D. ceased when Ms. LeBlanc and the case worker began sitting between the defendant and her children and never allowed them to be alone. One of the two observers went so far as to accompany the mother and child to the restroom.

According to Ms. LeBlanc, the visitation events began being scheduled

further apart because of the difficulty in scheduling the visits caused by the defendant's repeated moves. Additionally, after M.P.D.'s relocation to Ruston, the visits only included the two younger children. She stated that the most recent visit occurred a week prior to the hearing.

Ms. LeBlanc had visited the defendant during her six month stint as a home health care worker and found the defendant's living conditions to be unacceptable. The trailer was a mess, and the mattress on the floor in the defendant's room was overrun with soft drink cans and scattered food. Additionally, she observed dogs in the trailer and that the trailer reeked of smoke. Applying her own personal standards to the situation, she found it to be horrible; and she did not consider the trailer to be an acceptable environment for any healthy child, much less M.P.D. and J.N.A., who both draw SSI benefits based on their poor health.

After their removal from the defendant's custody, Ms. LeBlanc observed a drastic improvement in the children's health and attitude. J.N.A.'s teeth were badly decayed when she came into the state's custody; and during the ensuing months, her foster parents saw that she obtained the necessary treatment to correct the situation. In fact, the medical and dental needs of all three children had been addressed. Ms. LeBlanc suggested that the children would not reach their full potential unless they moved on with their lives, and she felt that this would not happen if they returned to their mother.

In considering the situation of the three children, Ms. LeBlanc asserted that M.P.D. had the most difficulties. The child had been in four or five foster placements since July of 2014, and was moved from each at the request of the foster family. Her transfer to the Ruston group home was necessary to address certain emotional behaviors that manifested themselves in M.P.D. on a regular

15

basis. As one example of M.P.D.'s emotional instability, Ms. LeBlanc related the story of M.P.D.'s imaginary child named Sophie. According to Ms. LeBlanc, M.P.D. believed that Sophie had been placed in a plastic bag by the defendant and deposited in a closet, where she still remains. Ms. LeBlanc suggested that M.P.D. also had visions of spirits and that she acted out sexually. With regard to M.P.D.'s immediate future in the event the juvenile court terminated parental rights, Ms. LeBlanc testified that no one was interested in adopting her.

Kayla Auzenne, a DCFS foster care worker, testified that when she assumed responsibility of the children's case in July of 2015, problems arose. She scheduled a visit with the defendant at a Sulphur, Louisiana address, where the defendant had been living with her current boyfriend, but before the visit could occur, the defendant informed her that she had moved to Jennings and was living with a friend, at what was to be a permanent address. Although Ms. Auzenne managed to visit the defendant at the Jennings address, within a few days thereafter, the defendant was evicted from that location because of her failure to follow house rules. This was just the beginning of the problems she experienced in communicating with the defendant in the months to come.

Ms. Auzenne understood that after her eviction, the defendant would be moving back to Sulphur to live with friends. However, Ms. Auzenne was unable to locate the defendant in Sulphur because her telephone could not be accessed, and when the defendant finally contacted Ms. Auzenne, she would not provide a telephone number where she could be contacted. When she appeared to testify at the termination hearing, Ms. Auzenne was of the understanding that the defendant resided in Sulphur, but at the hearing she became aware that the defendant was back in Iowa.

Ms. Auzenne noted that M.P.D. was doing great now as a result of the psychiatric help she was receiving; and that both R.M.D. and J.N.A. thrived in their foster homes. According to Ms. Auzenne, R.M.D. was in an adoptive home, but J.N.A. was not. At the time of the termination hearing, R.M.D. had no medical or mental issues, but J.N.A., who had issues with fluid in her ears, had tubes placed in her ears. All of the children came into the state's custody with poor dental hygiene, but those issues had since been addressed by the foster families.

Ms. Auzenne noted that the defendant simply failed to take advantage of the services offered to her by the state, despite numerous opportunities. Although she agreed with Ms. LeBlanc that the two younger children interacted well with the defendant and loved her, Ms. Auzenne was of the opinion that the children were not really sure that they wanted to be reunited with her. She observed that they were nervous about returning to the instability they previously experienced while living with the defendant.

Acknowledging that DCFS had previously returned the children to the defendant in 2012, Ms. Auzenne opined that the overall history of the entire custody matter caused DCFS to conclude that the defendant was incapable of working through her case management plan to its satisfaction. The multiple missed opportunities and her inability to follow even the basic requirements of the case management plan made this conclusion clear.

In the three months between the first hearing day and the second, the defendant continued to visit the younger children and the visits went well. Still, in the second day of the hearing, Ms. Auzenne continued to assert DCFS's position that the defendant's parental rights should be terminated. Apparently, during the three months, the defendant made no effort to work toward completing any of the

case management plan requirements.

*Abandonment*

We find no manifest error in the juvenile court's factual finding that the state proved by clear and convincing evidence, that the defendant abandoned her children as that term is defined in La.Ch.Code art. 1015(4)(b). The defendant failed to contribute $25.00 per month to her children's care while they were in foster care despite having several jobs that would have at least allowed her to attempt to comply. We find that $25.00 is an insignificant amount in the overall scheme set forth in the case management plan; and her argument that she could not pay the amount after losing custody and the children's income, rings hollow. While not being able to pay $25.00 per month, she managed to maintain herself and find the resources to move her residence some fourteen times. She admitted that instead of placing her children's interest first, she spent what extra money she acquired on cigarettes and cellular phone minutes.

Additionally, we find no merit in her argument that her mental health situation prevented her from complying with the case management plan. Pursuant to La.Ch.Code art. 1035(B), "The parent asserting a mental or physical disability as an affirmative defense to abandonment under Article 1015(4) bears the burden of proof by a preponderance of the evidence." Although the defendant claims she is incapable of working due to her mental condition, she failed to support this claim with any evidence other than her self-serving testimony. That being the case, we find no manifest error in the juvenile court's finding that the state proved by clear and convincing evidence, that the defendant abandoned her children by failing to provide significant contributions to their care and support for any six-month period that they were in the state's custody.

18

*Failure to Comply with Case Plan*

We also find no manifest error in the juvenile court's factual finding that the state proved, by clear and convincing evidence, that the defendant failed to substantially comply with her case plan, and that there is little likelihood that her condition or conduct will significantly improve in the near future.

In order to terminate the parental rights of a parent under La.Ch.Code art. 1015(5), the state has to prove by clear and convincing evidence that (1) a year has passed since the child was removed pursuant to court order; (2) there has been no substantial compliance of the case plan by the parent; and (3) there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future.

The juvenile court approved the removal of the children from the defendant's custody by an oral instanter order on July 29, 2014. That juvenile court then ratified and approved that action by a court order dated July 30, 2014. The state filed its petition seeking the termination of the defendant's parental rights on August 26, 2015. Thus, the state satisfied the first element of La.Ch.Code art. 1015(5).

The defendant's case plan required her to obtain stable housing, obtain a legal source of income, make the aforesaid monthly parental contributions, undergo a mental health assessment, participate in parenting classes, and maintain contact with her children. Of the six requirements, the defendant only made an effort to comply with the visitation requirement. Her minimal compliance relating to the remaining elements of the case plan came nowhere near the substantial compliance required. The defendant's defense that she was unable to comply because of a lack of income also rings hollow when most of the requirements had

no substantial cost associated with their compliance. She failed to establish stable housing, as evidenced by her approximately fourteen moves during the fifteen months her children were in custody; she never obtained any consistent legal source of income; and despite her claim that her mental condition prevented her from maintaining gainful employment, she presented no evidence to support that claim.

The defendant failed to complete her free-of-charge parenting class requirement because of her excessive absences. While she asserts this was because of a lack of transportation, the record establishes that she seemed to always find transportation for those activities she wanted to attend, such as visitation.

The defendant asserts that once she regains custody of her children, she will have no problem complying with the requirements of her case plan because she will have the children's SSI benefits. However, given her past history, we place little credence on this assertion. It is clear from the record that the defendant has never provided a safe and stable home for her children, even when she had access to their SSI benefits. In 2012, she and her children were living with a man accused of sexually abusing M.P.D. The defendant and her children were staying with a friend in Iowa when the state removed the children from her custody in the present matter. Now, she claims that she and the children will be living with four other people in a three-bedroom trailer, but only until they rent a larger place using a combination of her children's, her cousin's, her cousin's fiancé's, and her cousin's daughter's SSI benefits. Despite having access to low-income housing in the past, the defendant refused the housing rather than deprive herself of male companionship. Based on her past relationships and their effects on her children, we do not find that the defendant will be capable of providing safe and stable

20

housing for her children in the future.

Thus, we also affirm the juvenile court's finding that the state satisfied the second and third elements of La.Ch.Code art. 1015(5), by proving by clear and convincing evidence that the defendant substantially failed to comply with her case plan, and that there is no reasonable expectation of significant improvement in her condition or conduct in the near future.

***Best Interests of the Child***

In her final assignment of error, the defendant claims "[t]hat one thing that is glaringly obvious in this case is the State's failure to prove by clear and convincing evidence that terminating [her] parental rights was in the best interest of the children." We disagree.

A child's interest in terminating parental rights has been found to be superior and paramount to a parent's interest in maintaining those rights. *State ex rel. H.A.B.*, 49 So.3d 345. As stated by the supreme court:

> [T]he child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care as "[t]here is little that can be as detrimental to a child's sound development as uncertainty over [where] he is to remain." *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513, 102 S.Ct. 3231, 3238, 73 L.Ed.2d 928 (1982).

*Id.* at 366 (first alteration ours).

In this instance, these children have already experienced several years of uncertainty over their domicile due to their mother's constant movement from place to place and relationship to relationship. Her 2012 case arose because she and the children were staying with a man, whom DCFS had investigated for sexual abuse of M.P.D. in 2011. After the children were removed from her custody in that matter, the defendant entered into a relationship with a man who had

21

previously been charged with indecent behavior with a juvenile. It was with this man, and his fiancé, that she moved in with in September of 2015, after her children were removed from her custody in the current matter. She further admitted that she moved in with yet another man shortly after meeting him in 2015, but then broke up with him approximately three months later because he told her lies about himself. She testified that of the approximately fourteen locations where she lived between July 29, 2014, and October 7, 2015, including the two just described, she had permission for her children to live with her had she regained custody during that time. We find that her claim that she will not have a boyfriend in the future, is a promise destined to be broken.

At the time of the termination hearing, the children were eleven, nine, and eight years old. M.P.D. suffers from a heart condition, and J.N.A. suffers from a milder dandy walker variant, which is a milder version of a congenital brain defect. All three children required medical and dental treatment at the time they were taken into custody. In fact, the dental treatment required by J.N.A. was so extensive that it required the treatment be performed under general anesthesia in the hospital. J.N.A. further has had several sets of tubes in her ears, which require close monitoring to avoid infection.

M.P.D. also suffers from mental issues, for which she is currently receiving treatment through the group home in Ruston. She has accused several of her mother's male friends of sexually abusing her, allegations which her mother refused to believe. During the time she has been in custody, M.P.D. reported the vision involving the baby, which her mother put in a plastic bag and in the closet, and her encounters with spirits. Prior to being placed in the group home, she was removed several times from foster homes due to her acting out sexually. Now that

22

she is in the group home, she is doing better.

There is no doubt that there is a bond between the defendant and her children, as well as between the children themselves. The defendant claims that she wants to regain custody because she fears that the children will never be reunited if her parental rights are terminated; and if they are returned, she will finally cooperate with DCFS. However, it appears from her testimony that the defendant's main reason for regaining custody is to regain access to the children's SSI benefits. Furthermore, based on the record and Ms. Auzenne's testimony, the defendant has already had many failed opportunities to cooperate with DCFS.

Based on the foregoing evidence, we find that it was not manifestly erroneous for the juvenile court to find that the state satisfied its burden of proving that it was in the best interest of M.P.D., R.M.D., and J.N.A. that the defendant's parental rights be terminated.

## DISPOSITION

For the foregoing reasons, we affirm the judgment of the juvenile court terminating the parental rights of T.M.D. to her minor children M.P.D., R.M.D., and J.N.A. and certifying them free for adoption. We assess all costs of this appeal to T.M.D.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.